ROBERT C. LIVENGOOD, PLAINTIFF v. PIEDMONT AND NORTHERN RAILWAY COMPANY, DEFENDANT, AND THIRD-PARTY PLAINTIFF v. TRANSCONTINENTAL GAS PIPE LINE CORPORATION, THIRD-PARTY DEFENDANT

No. 7326SC47

(Filed 13 June 1973)

**Carriers § 8— injury to person unloading freight — alleged defective hand brakes — inspection — insufficiency of evidence of negligence**

In this action against a railroad to recover for injuries received by plaintiff, who was unloading pipe from freight cars for the consignee, when a car plaintiff was attempting to position for unloading by controlling its movement down an incline with the hand brakes collided with an empty car on the track, the evidence was insufficient to support findings that the brakes were insufficient to control and stop the car under the existing conditions and that defendant failed to make a reasonable inspection of the brakes where the evidence showed that as the car picked up speed plaintiff and another kept tightening down on the brakes until "they wouldn't tighten down anymore," that after the loaded car became part of defendant's train the hand braking system was twice visually inspected for defects before the accident and that the hand brake was working properly after the accident.

APPEAL by defendant, Piedmont and Northern Railway Company, from *McLean, Judge,* 18 June 1972 Session of Superior Court, MECKLENBURG County.

Plaintiff, an employee of Parkhill Truck Company (hereinafter called Parkhill), was injured on 9 July 1966, while engaged in the operation of unloading freight cars in the Town of Ranlo, Gaston County. Parkhill had a contract with Transcontinental Gas Pipe Line Corporation (hereinafter called Transcontinental) to unload pipe consigned to Transcontinental at Ranlo and move the pipe to Transcontinental's storage site near Ranlo. Both these companies are based in Tulsa, Oklahoma. The pipe which was being unloaded was shipped from Houston, Texas. It arrived at Piedmont and Northern Railway Company's (hereinafter called Piedmont) Pinoca Yard at Charlotte via Seaboard Air Line Railroad Company on 4 July 1966. Piedmont then moved the cars over its rails to Ranlo. Plaintiff was injured in the unloading operation. He alleged that the site for unloading was selected by Piedmont and it failed to provide plaintiff a safe place to work, that the brakes on the car in which plaintiff was injured were defective, that Piedmont failed to provide a switch engine when it knew that to attempt to move the cars

Livengood v. Railway Co.

by hand would or could cause injury to those working on the freight cars.

Piedmont denied the material allegations and pleaded plaintiff's contributory negligence. Subsequently Piedmont, after motion granted, served summons and third-party complaint on Transcontinental alleging alternative claims for indemnity or contribution. Transcontinental moved for judgment on the pleadings and for dismissal of the complaint for failure to state a claim. Both were denied. Transcontinental answered denying liability. On its own motion, the court entered an order peremptorily setting the matter for hearing, fixing a deadline within which discovery must be completed, and severing the issues raised by the third-party complaint and ordering a separate trial at a later time.

The matter was heard by the court without a jury, all parties having waived jury trial.

Upon completion of plaintiff's evidence, Piedmont moved for dismissal and involuntary nonsuit pursuant to Rule 41(b) and asked to be heard. The court at that point said: "First, before I hear you, now, what are your allegations of negligence?" Plaintiff's counsel replied: "Your honor, my allegations of negligence is the defective braking mechanism which the defendant knew or should have known was present." After Piedmont's counsel completed his argument, the court denied the motion. During the course of defendant's evidence the court ruled that site selection and control of the loading operations were not applicable and said "[N]ow, the question is as to whether or not the brakes on this particular car were defective at this time." Plaintiff's counsel then said: "Or brakes sufficient to hold this car loaded like it was on the grade that the engineer testified about. I think that enters into it." Court: "Well, I wouldn't think so. I think you are down to the question of whether or not these particular brakes were defective." Plaintiff's counsel insisted that in addition to alleging defective brakes he alleged "that they knew or should have known that it would not hold this car coming off a steep grade." Our study of plaintiff's complaint reveals no such allegation. The complaint does not refer to a steep grade. It does allege that the cars had been parked on an incline and that the plaintiff was directed to release the brake and permit the car to roll down the incline toward the position for unloading.

At the close of all the evidence, Piedmont renewed its motion for involuntary dismissal. The court did not rule on the motion, but continued the matter for arguments of counsel and submission of proposed findings of fact. On 1 July 1972, the court entered judgment finding actionable negligence as to Piedmont and awarding plaintiff $85,060. On the same day, the court entered an order granting Transcontinental's motion for summary judgment. Piedmont excepted and appealed from the entry of the judgment and the order.

*Hedrick, McKnight, Parham, Helms, Warley and Kellam, by Philip R. Hedrick, for plaintiff appellee.*

*Cansler, Lockhart and Eller, P.A., by Thomas R. Eller, Jr., and Richard D. Stephens, for Piedmont and Northern Railway Company, defendant and third-party plaintiff appellant.*

*Kennedy, Covington, Lobdell and Hickman, by Edgar Love, III, for third-party defendant appellee Transcontinental Gas Pipe Line Corporation.*

MORRIS, Judge.

Appellant brings forward and argues 53 assignments of error based on 52 exceptions. Twenty-five of the assignments of error are addressed to the question of whether the court erred in finding negligence on the part of Piedmont, proximately causing plaintiff's injuries, and entering judgment in favor of plaintiff based on those findings.

The record reveals that at the close of all the evidence, Piedmont renewed its motion for involuntary dismissal under Rule 41(b) and tendered findings of fact and conclusions of law. We are of the opinion that the motion should have been granted.

There is no question but that plaintiff sustained serious injuries, some of them permanent in nature. Negligence, however, is never presumed from the mere fact that an accident occurred. Piedmont's liability, therefore, does not arise unless plaintiff has established by competent evidence that Piedmont was negligent and that its negligence was a proximate cause of plaintiff's injuries.

Plaintiff was not an employee of the railroad, and the court properly ordered stricken the allegations with respect to Piedmont's failure to provide a safe place to work.

The evidence, briefly summarized, tended to show that plaintiff, an employee of Parkhill, had worked as a pipe liner for some 18 years, that he had some familiarity with railroad cars and had had some experience in the very type of unloading operation being performed at the time of his injury. Parkhill, under a contract with Transcontinental, unloaded pipe consigned to Transcontinental and moved it by motor carrier to Transcontinental's storage site. The pipe being unloaded originated as a shipment of eight cars on Southern Pacific at Houston, Texas. After interchange with four other railroads, it arrived at Piedmont's Pinoca Yard at Charlotte on 4 July 1966. The car was received by Piedmont as part of its train No. 89. This train No. 89 was visually inspected and no defects were observed. On 5 July 1966, the car was a part of train No. 71 and left for Gastonia and points between Charlotte and Gastonia. Ranlo, the point at which the unloading was done, is a point between Pinoca and Gastonia. The eight cars were again inspected by a different car inspector on 5 July 1966, and no defects were found. Uncontradicted evidence was that the cars were inspected with respect to safety mechanisms including hand wheel, brake shoes, brake chains, and brake platforms. When the cars arrived at Ranlo, seven were "spotted above Central Avenue" and one, down below. Those above Central Avenue were on a slight grade. They were tied down, chocks put down, and the brake put on. A brakeman for Seaboard tested the car. "Everything was working perfect on it." The car was moved back to Pinoca on 9 July 1966 and placed on what is referred to as the "scale" track. This is a track on which cars are placed which are in need of repair. It remained there until 12 July 1966, when a full mechanical inspection was made, including testing the brakes. No defects were found.

Plaintiff arrived at the unloading site on 8 July 1966. At least two of the cars were "floated down" on the 8th. Plaintiff was uncertain as to whether he participated in the operation on the 8th but was certain that he had "let several of them down that morning," referring to the morning of the 9th. He testified, "And as to prior to July 9, 1966, oh, yes, I had floated cars down by means of gravity, using the hand brake before, and as to how long it had been, it hadn't been too long before then." The plaintiff testified, with respect to the grade, on direct examination as follows:

"As to the grade from back at the extreme end of the siding down to the unloading place, well, it was steep enough

grade that the cars would pick up right smart speed. From back in this end of it where we would have to start from the North end of it, it came down and then there is another little incline here which gives it a dip and after we come over it, then you had more downgrade which give you more speed into the unloading site."

The procedure was first to be sure that the car from which a car was being uncoupled had sufficient scotches, then break the lead car loose, bleed the air down, get on the car and release the brakes and let it start rolling down but not let it roll too fast, and start braking back as soon as the car started rolling. If one stood in the car facing the direction in which the car was to go, the braking mechanism was on the right hand side. Plaintiff testified that the car in which he was injured had the old lever type brake. Every other witness who testified with respect to the type of brake testified that it was the wheel and lever type generally referred to as the Ajax hand brake. All exhibits indicate that the brake was the Ajax brake. Plaintiff testified that he had moved cars before with this type brake on them and knew how to operate this type brake. Expert testimony on the operation of the brake was to the effect that the operator positions himself with one foot on the brake step and one foot on a rung of the ladder, holding on with the left hand to the hand hold or ladder rung and operating the lever and wheel of the brake with the right hand. Plaintiff testified that he was inside the car because there was no platform on which to stand. The man assisting him, Burchfield, was on the outside of the car on the left side. When plaintiff got up on the car, "the hand brakes, emergency brakes, were holding the car. The hand brakes on the car were working at that time and they were holding it." Plaintiff testified that it was not customary to operate the hand brakes on a railroad car from inside the car. When he got inside the car, he "let off on the brakes" so it would start rolling. He "flipped the on mechanism back in position." When he released the brake to let it move, he "released it just a little bit" and it started rolling. He didn't release it any more. Then Burchfield "flipped it back over on on position to hold the brakes" when plaintiff started tightening them down. "We started tightening down on them and it taken effect for a little bit, then they just wouldn't hold no more, just kept getting faster and we kept tightening down on them and they wouldn't tighten down any more. They went so tight and that was it." Jay Burchfield, plaintiff's co-worker, testified (by

deposition) for Piedmont and stated that plaintiff started off standing on the brake platform but got inside the car when it started rolling. The car hit another car and plaintiff was injured. Immediately after the accident, the car was moved back by winch and crane. When it started rolling, an employee of defendant "mounted the brake platform and tightened the brake just tight enough to tighten the chain." When they got the car up under the boom, he "tied a good hand brake." While the brakes were tied down Piedmont's brakeman and superintendent pulled it with a locomative without the air brakes connected. In this test, the wheels slid on the rails. This evidence was uncontradicted.

Evidence with respect to the grade, in addition to plaintiff's description, was that the average grade of the track was 2.5%—the grade falling an average of 2.5 feet for each 100 feet of track. The car in which plaintiff was riding traveled approximately 500 feet before it collided with an empty car on the track. Piedmont's superintendent testified that he would consider the grade 1.5% "looking at it in railroad language," and would characterized it as a slight grade. He further testified that a grade of 3.7% would be "steep considerable, but not out of line, I wouldn't say."

The last witness for plaintiff (by deposition) before plaintiff rested was an employee of Transcontinental whose duties were to handle all freight shipments for the company. It was his responsibilities to determine the most feasible location for shipment of pipe in North Carolina. He testified:

"There was nothing unusual or hazardous out of the ordinary about the Ranlo site when I looked at it on April 6, 1966. It looked rather normal as a piece of railroad track. It wasn't much used, and I didn't see anything hazardous about it. It looked like as level as this table almost to me. I would say that it wouldn't really make any difference to Mr. Owens if it was level or graded as long as he got the cars put in there. If Mr. Owens on April 6, 1966, had said this site was unacceptable, I don't think I would have directed the pipe be shipped to Ranlo."

Plaintiff, in his complaint and throughout plaintiff's evidence, relied on allegations of defective brakes. During defendant's evidence, he stated that in addition he was contending that Piedmont failed to furnish a car with "brakes sufficient to hold

this car loaded like it was on the grade that the engineer testified about." Whether this variance between the complaint and proof is cured under the new rules by the application of the "litigation by consent" doctrine arising under G.S. 1A-1, Rule 15, (see 1 McIntosh, N. C. Practice 2d, 1970 Supp., § 970.80) we do not decide. Suffice it to say we do not think the evidence sufficient under either theory. In *Yandell v. Fireproofing Corp.,* 239 N.C. 1, 6, 79 S.E. 2d 223 (1953), Justice Ervin, speaking for a unanimous Court said:

> "A delivering carrier by rail, which delivers to the consignee for unloading a car received by it from a connecting carrier, owes to the employees of the consignee, who are required to unload the car, the legal duty to make a reasonable inspection of the car to ascertain whether it is reasonably safe for unloading, and to repair or give warning of any dangerous condition in the car discoverable by such an inspection."

Piedmont owed no higher duty to plaintiff here. We think that logic requires that the reasonable inspection required by *Yandell, supra,* was met when Piedmont's inspection disclosed no visible defects—patent defects. See *Butler v. Central of Georgia Ry. Co.,* 87 Ga. App. 492, 74 S.E. 2d 395 (1953). In our view Piedmont was not held to the duty of discovering by its inspection latent defects. The evidence is uncontradicted that Piedmont inspected the car when it got to Pinoca, again before it left for Ranlo, and again after the accident. The testimony of the inspectors was clearly sufficient to disclose reasonable inspections. The question of duty to inspect most generally arises when there is evidence of a defect. *Yandell v. Fireproofing Corp., supra.* Here, however, plaintiff's evidence contained not a scintilla of evidence as to what was defective about the braking system. The only evidence was the brakes "wouldn't tighten down any more." Whether the alleged defect was such a defect as should have been discovered by the inspection we cannot say, for the record before us is silent as to what the alleged defect was.

Plaintiff introduced no evidence with respect to the weight or capacity of the car loaded or unloaded. The uncontradicted evidence from defendant was that the capacity of the car was 154,000 pounds and the load limit of the car was 165,000 pounds. The pipe was 36 inches in diameter and 40 feet long. The car contained seven joints of pipe. The weight of the joints will

vary, but the load on this car weighed "a little better than 85,000 pounds." There is no evidence of what effect, if any, this load—considerably less than the maximum—had on the operation of the braking system.

The court found as a fact "[t]hat the car on which the plaintiff was injured was not equipped with brakes sufficient to control and stop it under the conditions and circumstances then and there existing." We are of the opinion that there was not sufficient evidence to justify this finding of fact nor the conclusion of law worded exactly the same.

Nor, as indicated above, do we find sufficient evidence to support the finding of fact "[t]hat the defendant failed to make a reasonable inspection and determination of the condition of the brakes of the car on which the plaintiff was injured," or the conclusion of law in the same language.

Having concluded, as we do, that plaintiff has failed to carry his burden of proof, we do not discuss the question of plaintiff's contributory negligence nor the court's granting summary judgment in favor of the third-party defendant, Transcontinental.

Reversed.

Judges CAMPBELL and BRITT concur.